(86 App. Div. 126.)

## THOUSAND ISLAND STEAMBOAT CO. v. VISGAR et al.

(Supreme Court, Appellate Division, Fourth Department.   July 7, 1903.)

1. WHARVES—RIGHTS OF THE PUBLIC.
    An owner of land adjacent to a navigable river, without express authority from the state, constructed a wharf in the bed of the river. The wharf was substantially open to public use, by vessels engaged in navigating the river, for about 18 years, on making compensation to the owner for the privilege. Held, that there was no evidence of any continued user, sufficient to give the public a right to use the wharf.

2. SAME—GRANT FROM THE STATE—EFFECT.
    The state in 1883 granted letters patent to certain persons, owning land abutting on a navigable river, of land in the bed of the river. The grants recited that they were for the purpose of promoting commerce, and on the conditions therein mentioned. One of the conditions provided that if the grantees should not, within five years, apply the premises granted to the purpose of commerce, by erecting docks thereon, then the grants should become void. In 1897 the state granted letters patent to one of these persons of a part of the property described in the letters patent of 1883. This grant did not state the purpose or contain the condition expressed in the prior grants. These owners at the time of the patents, in 1883, owned docks erected by them, without authority from the state, on the sites conveyed. They continued to maintain them. Held, that the use of the docks for commercial purposes was open to the public on the payment of proper compensation therefor.

3. SAME—RIGHT OF PUBLIC TO ADJACENT LAND.
    Where owners of land abutting on a navigable stream accepted grants from the state conveying to them land under water, conditioned on their erecting docks thereon for the purpose of promoting commerce, and erected and maintained the docks, the owners also conferred on the public the incidental right to pass over their abutting lands as far as necessary to go to and from the docks.

4. SAME—OWNER'S RIGHT TO ENJOIN ONE FROM USING HIS WHARVES.
    One bound to erect and maintain docks for the use of the public, by virtue of his acceptance of a grant from the state, cannot come into a court of equity and ask that another be restrained from using the docks, though the obligation to maintain the docks for public use rests on a contract with the state, which it alone can enforce.

Appeal from Trial Term, Jefferson County.

Suit by the Thousand Island Steamboat Company against Walter L. Visgar and another.   From a judgment, on the report of a referee, restraining defendants from landing their boats at, and from going or entering on, for the purpose of soliciting passengers or traffic for their boats, wharves known as Fine View, Crossman, and Cornwall Wharves, on the St. Lawrence river, defendants appeal. Reversed in part, and affirmed in part.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and HISCOCK, JJ.

Theodore E. Hancock, for appellants.
Henry Purcell, for respondent.

HISCOCK, J.   We think that the judgment appealed from is erroneous in so far as it restrains the defendants from landing their boats at, and, for the legitimate and ordinary purposes of their business in connection therewith, entering and going upon the Crossman and Cornwall Wharves.

It will be necessary to a proper appreciation and understanding of the legal questions involved upon this appeal to go somewhat into the history of the parties, and into a history and description of· the wharves over which the controversy has arisen, leading up to this litigation.

The dispute between the parties apparently originated in the rivalries of the steamboat business upon the St. Lawrence river. The plaintiff for several years before the commencement of this action had been engaged in the business of operating a line of steamboats upon that river, carrying passengers and freight, and touching at various points; including, among others, the wharves already mentioned. The defendants were engaged in substantially the same business, although perhaps upon a somewhat smaller scale. The wharves in question are all of considerable size, each being 200 feet or more in water frontage. They run substantially parallel with the current of the river, and all of them project beyond low-water mark over and upon the bed of the stream. Each one was constructed by the owner or owners of the shore or upland property in front of such property, and extending out into the river. There is no public thoroughfare extending from any of the wharves over and through the adjacent lands, but passage must be had over the private premises of the owners of the wharves.

The Fine View Wharf is situated at Wellsley Island, and furthest up the river. The other two wharves are located at the village of Alexandria Bay. There is sufficient depth of water at the latter so that they are accessible for use by all of the steamers which ply upon the river. The first-mentioned wharf has a lesser depth of water at its side, and cannot be used by some of the largest steamers. Each of the wharves is an evolution, by extension and addition, of an originally smaller structure. The Fine View Wharf, at the time of the transactions in question, was owned by one Pierce, and located in front of premises owned and used by him as a summer hotel, and the original wharf of which it was an enlargement was built about 18 years ago. The Cornwall Wharf in 1902 was owned by Andrew Cornwall and others, comprising the firm of Cornwall Bros., and was produced by the enlargement and addition of a wharf which in one form and another had existed at the same point for 50 years or more. The Crossman Dock was owned by some people of that name, and located in front of premises owned by them upon which they operated a hotel; and there had been located at this same place, also, a dock owned and operated by said Crossmans and their predecessors in title for a period of 50 years or more.

In 1902, in the case of the Fine View and Cornwall Wharves, and some years prior thereto in the case of the Crossman Wharf, plaintiff obtained a lease from the respective owners of those properties, purporting to grant and convey to it the exclusive control and possession thereof; and such leases were in existence at the time of the commencement of this action, and were made the basis of plaintiff's claim ·of right to exclude defendants from the use and privileges of said landing places. Up to the time when plaintiff brought this action, whereby it seeks to prevent defendants from land-

ing at and using said docks, with the exception of a course of exclusion pursued or attempted to be pursued by it towards defendants upon one of more prior occasions, they had all been substantially open to public use by all of the steamers and boats engaged in navigating the St. Lawrence river, and which in turn paid compensation to the respective owners for such use and privileges.  The plaintiff established that upon a few isolated and widely separated occasions some boat had been forbidden the use of one of the wharves, but this was evidently due to some special reason; and neither the evidence, nor the findings of the learned referee, warrants any other view than that stated—of a general use of the wharves by any one who desired so to do, upon a compensation charged by the owners; and, as a necessary incident to such general and public use thereof, passage to and from the wharf over the adjacent lands of the owner was permitted.  There was no means of approach to Wellsley Island except by water, and, so far as the evidence discloses, the same is true of Alexandria Bay, so far as any public means of conveyance is concerned.

In attempting to prevent defendants from landing their boats at the points in question, it is apparent that plaintiff is actuated in part, at least, by the desire to secure an advantage over a business rival.  The defendants do not controvert its claims that it has secured leases purporting to give it exclusive rights of use and possession from the people who are the owners of the wharves and of the respectively adjacent shore lands.  Defendants, however, insist that the general public engaged in commerce and trade upon the St. Lawrence river have so acquired the right to use these wharves, upon a proper and reasonable compensation therefor, that neither the plaintiff nor the lessors, the owners thereof, can exclude it therefrom. This contention of defendants is based upon the claim that said wharves have become public ones, and that they have become and been made so through long-continued public usage, and also, in the case of two of them, through conditions in the grants by the state of the land in the river upon which they stand which compel their submission to a public and general use and enjoyment.

After consideration of the propositions thus presented, we agree with the view adopted by the learned referee—that there was no such evidence of long-continued or uninterrupted user by the public of the Fine View Wharf as would justify us in holding that thereby the public acquired the irrevocable right to use the same.  In the case of this wharf there has been no grant by the state of the lands in the bed of the river whereon it stands, and therefore, necessarily, no conditions imposed by the state, and accepted by the owners, governing its nature, and imposing upon it the character and condition of a public wharf.  The owners of the adjacent lands have seen fit, without express authority from the state, to construct their property into the bed of the river.  If thereby they have in any way interfered with the rights of the public in the stream, or created a purpresture or nuisance, the remedy rests with the state for the removal thereof; and their conduct, even if wrongful and that of trespassers, would not give the defendants a right to use the property.

In the case of the other wharves, we have concluded to place our decision in favor of defendants' right to use the same upon the conditions contained in the grants by the state to the respective owners thereof. We therefore pass directly to a consideration of the patents, issued through the Land Office, of the property in the bed of the stream whereon these structures stand.

Three letters patent were granted to Charles W. Crossman and others, of the lands whereon the Crossman Dock is said to stand, two of these being dated December 28, 1883, and one February 25, 1897; and one grant of similar nature was made to Andrew Cornwall and others, of the site of the Cornwall Dock, dated December 28, 1883. Each of the grants of the year 1883, to whichever site relating, recited that it was made "for the purpose of promoting the commerce of our said state and for no other object or purpose whatsoever, and with the reservations and upon the conditions hereinafter mentioned," and of which conditions one was that if the grantees therein named should not, "within five years from the date hereof, actually appropriate and apply the above-described premises to the purposes of commerce by erecting a dock or docks thereon, and filling in the same," then said presents and everything therein contained should "cease, determine, and become void." The letters patent to the Crossmans, dated in 1897, did not express said purpose or contain said condition. We have no doubt that the grantees in these various patents of 1883 accepted the same for the purposes and upon the conditions therein contained, and thereby became bound by contractual obligations to fulfill such purposes and conditions according to their true intent and meaning, which we shall presently consider.

It is suggested (and correctly, according to the evidence) that, at the time of these various grants, docks already stood upon the sites respectively thereby conveyed, and that the owners of the adjoining uplands, under the general principles of law applicable thereto, without any express grant or conveyance, had the right, within certain conditions, of maintaining wharves extending into the river; and it is intimated, rather than seriously argued, perhaps, that therefore there was no consideration for the assumption by the grantees of the conditions and obligations set forth in the patents. We do not, however, regard such view as well founded. The originals of the present wharves had been built prior to the date in question, but they have been enlarged and maintained since upon the lands conveyed. It is not very valuable to speculate upon the exact motives which prompted the Crossmans and Cornwalls to desire these grants and conveyances of express rights from the state. But it may very easily be imagined that rather than have their respective properties subject to the controversies and uncertainties which might arise over wharves constructed into the bed of a navigable river, under the general principles of law applicable thereto, without any conveyance from the state, they desired to have their property rights definitely and strictly defined, and protected by cession from the state, even though, as a condition thereto, they assumed certain obligations and undertakings. At any rate, they did accept the conveyances, and ever since

have held and acted in apparent reliance upon the same, without any thought of surrendering the rights which they thereby secured, and there is now no place for the argument that they are not bound by the burdens which accompanied those conveyances.

Neither do we think that there is any opportunity to hold that the letters patent of 1897, which contained no statement of purposes or conditions for and upon which they were made, are to be construed as relieving the grantees therein named from the obligations of the prior grants of 1883. The later conveyance covers only part of the property covered by those of 1883, and, so far as we are able to discover, the evidence does not disclose how the Crossman Wharf stands with reference to the parcels covered by the patents of the two different years. We presume it stands upon the land covered by both. We think it would be an unwarrantable construction and conclusion to hold that the officials of the state, in derogation of public rights, and, so far as appears, without any adequate consideration, intended by the later conveyance to relieve the grantees of the obligations which they had then assumed by accepting the earlier grants.

Holding, therefore, that the ownership of these two wharves in plaintiff's predecessors in title rests upon grants, with the effect of contracts which dedicate them to "the purpose of promoting the commerce of our said state," and contain conditions pointing in a similar direction, we come to a construction of the meaning of the language used.

Bearing in mind that the grants in question were made under public statutes, in behalf of the people of the state, of property and rights which belong to them, in a great, navigable river, are we to hold that the commerce intended to be created and promoted was the general public commerce of the state, as it was carried on upon the river St. Lawrence, and by any public carrier who saw fit to participate therein, or was the commerce referred to dependent upon and subject to such boundaries, limitations, and favoritism as the owners of the wharves, in the exercise of their judgment or caprice, might see fit to impose? For there is no finding or evidence or suggestion in this case that defendants are not public carriers of passengers and freight, engaged in the pursuit of such commerce as exists upon the St. Lawrence river, or that they have been guilty of any such misconduct as warrants the application to them of rules of personal exclusion. If the privileges of the wharves in question may properly be denied to them, then we see no reason why the spirit of denial and exclusion may not be extended to one after another of the steamboat lines plying upon the river, until they have all been prohibited, except the plaintiff or some other line favored by the owners, and the use of these wharves reduced from a public one, for the general convenience of the people, to that of a private nature, devoted simply and solely to the personal aims and convenience of the owners or their lessees. It seems to us that the bare statement of this question carries with it the answer, and that the commerce contemplated by the grants was the general public commerce carried on by all of the people who saw fit to engage therein; that the nature of the

obligations which the grantees assumed was of the same general public character as the property and rights which they secured in consideration therefor; that these defendants, and others who may be engaged in a similar occupation, had the right, subject to proper regulations, and the payment of a reasonable and proper compensation therefor, to use these wharves in a reasonable way for the running of their boats, the reception and discharge of their passengers and freight, and for the proper and reasonable advertisement of their boats, and solicitation of business therefor. We do not, of course, lose sight of the fact that this decision involves the subjection of the adjacent uplands to the use and passage of the public. As a matter of fact, they seem to be already subject to such usage for the purposes and convenience of all other carriers except the defendants. If the use thereof by the latter's customers shall somewhat increase the burden already imposed thereon, we have no trouble in concluding that if we are right in our view that the plaintiff's predecessors, by their acceptance of the grants in question, dedicated their docks to public usage, they also conferred the incidental right, so far as necessary, to pass over their adjacent lands.

It would require too much space to review in detail the many authorities which have been cited by the learned counsel for the respective parties as bearing upon the interesting question under consideration. We may refer to two of them.

The case of Wetmore v. Brooklyn Gaslight Company, 42 N. Y. 384, especially relied upon by the respondent, seems to be clearly distinguishable from the case at bar, and not to sustain the position taken by the plaintiff herein. In that case the dispute arose over the exclusion of plaintiff from the use of defendant's bulkhead and premises, constructed upon land under the navigable waters of the East river under a grant from the state. It was insisted that the right conveyed to the defendant to construct such a wharf was subject to the use of the public for commercial purposes, with the right of accepting the payment of the customary charges from those using them, and that it was not intended to give an absolute title to the owner of the structures and lands acquired. The answer made to this claim of plaintiff most clearly and definitely sustained by the court was that there was nothing in the acts conferring the right which showed any intention to confer a franchise or title subject to such rights in the public. The court took occasion to say:

"If there had been an intention to confer the right claimed upon the public, the right of erecting the structures and filling in would have been given upon the condition that the public should not only have the right to use the structures and the land acquired by the filling, but also the shore lands of the owners to an extent sufficient to make the right available. The absence of any provision conferring any right upon the public to use any portion of the structures or land made by filling in, or that upon the margin, is conclusive that the Legislature did not intend to confer any such right."

If we are right in our construction of the language used in the conveyances under review here, the state did precisely what it omitted to do in the Wetmore Case. It made the grants to plaintiff's predecessors subject to the rights of the public to use the wharves and the adjacent lands so far as necessary for the purposes of commerce.

We think that the case of Harper v. Williams et al., 110 N. Y. 260, 18 N. E. 77, cited by the appellants, does clearly sustain the construction and the conclusions which we have adopted. That action was brought by the plaintiff to restrain the defendants from the use of a dock built by him upon Long Island Sound, upon premises covered by a grant from the Commissioners of the Land Office of the state, which recited that it was made "for the purpose of promoting the commerce of our said state, and for no other object or purpose whatsoever, and with the reservations and upon the condition hereinafter mentioned." The grant was of "power and authority to erect any dock or docks that shall be necessary to promote the commerce of our said state" upon the land described in the grant, and "authority to collect from persons using such dock or docks reasonable and accustomed dockage, to be regulated by our Legislature." It was held that plaintiff's dock was subject to public usage, and that he could not exclude therefrom the public, of which the defendants were a part.

So far as the right of the public to use the docks erected is concerned, we see no difference in principle between the case cited and that now under review. In each case the grant by the state was expressed, in identically similar language, to be "for the purpose of promoting the commerce of our said state, and for no other object or purpose whatever, with the reservations and upon the conditions hereinafter contained." The expression of this purpose in the case cited was followed by a direct grant of the power to erect docks so far as the same "should be necessary to promote the commerce of our said state," with authority to collect a reasonable dockage, etc. In the case at bar the statement of the purpose for which the grant was made was followed by a condition that the same should be void if the grantees did not actually appropriate the granted premises "to the purposes of commerce by erecting a dock or docks," etc. This condition was binding upon the grantees, and they have erected and are now maintaining the docks. In each case the language which measured and characterized the use of the docks when erected was that they should be devoted to the "purposes of commerce." The Court of Appeals, by its decision referred to, adjudicates that the commerce to be thus subserved was a public and general commerce, which prevented the owners from excluding the plaintiff or any other member of the public desiring to use the property within the limits mentioned. Such adjudication seems to lead with controlling force to our parallel conclusion in this case that the docks leased by plaintiffs were dedicated to a general public use for commercial interests, which forbade the exclusion of the defendants. We do not think that the right expressly granted to plaintiff in the case cited to collect dockage impairs at all the authority of that case upon the question as here involved. One of the objects expressed in the grant of such right was to place it subject to the supervision and control of the Legislature. It is not questioned, and we have no doubt in this case, that the owners of the wharves in question, as an incident to their erection and maintenance for public purposes, had the right to charge reasonable fees for such use.

Finally it is suggested in the elaborate and carefully considered opinion of the learned referee, in substance, that if it be assumed that plaintiff's lessors became bound, in the conditions of their respective grants, to erect and maintain wharves which should be for the benefit and use of the general public, and that it was a violation of their obligations to exclude defendants, still their obligations rested upon a contract with the state, and that it alone could pursue a remedy for such violation. We do not deem it necessary in this case to decide how far the defendants, as plaintiffs, might go in enforcing obligations made for their benefit, as part of the public, by the state with its grantees. We do not think that that question is necessarily here. The defendants are not plaintiffs seeking to pursue some remedy. The relations of the parties litigant in respect to the affirmative is the reverse of that which it seems to us is implied in this suggestion by the learned referee. The lessor of the docks, as a plaintiff, has come into a court of equity, asking that it should assist it, in violation, as we have held, of the obligations which rested upon it, to unlawfully exclude defendants from the docks in question. It is asking this court to furnish power and authority to aid in violating the obligations which it has assumed with the state for the benefit of the public, of which defendants are a part. It is well settled, upon principle and by precedent, that the court will not take such a part for such purposes.

The judgment appealed from should be reversed in so far as it, in effect, adjudges that the defendants, their agents and employés, be restrained from landing their boats at the Cornwall Wharf or the Crossman Wharf during the period covered by the leases held by the plaintiff, and that said defendants, their agents, servants, etc., be restrained from entering or going upon either of said wharves during said period for the purpose of soliciting passengers or traffic for their boats, and a new trial granted upon questions of law and of fact; and said judgment is affirmed in so far as it adjudges with respect to the Fine View Wharf. This decision to be without costs to either party, as against the other, of this appeal. All concur.